## **AFFIDAVIT OF TASK FORCE AGENT TODD PROUGH**

I, Todd F. Prough, being duly sworn, hereby depose and state as follows:

### **INTRODUCTION**

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed for approximately seven years. I am currently assigned to the Cross Borders Initiative of the DEA in Lowell, Massachusetts. Prior to joining the DEA, I was employed as a detective with the Lycoming County District Attorney's Office in Lycoming County, Pennsylvania, for approximately three years. During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

2. In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers. Since joining the DEA, I have participated in numerous narcotics investigations as a case agent and in a subsidiary role. I have debriefed more than 100 defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics

trafficking organizations. I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire and electronic communications. During my law enforcement career, I have also participated in the preparation and/or execution of numerous search warrants.

3.  One particular investigation that I have been involved in is <u>United States v. Bryan Moran, et al.</u>, Criminal No. 02-10136 (REK). This was a drug investigation involving the February, 2002 death of 19 year-old Matthew Lessard from a heroin overdose. Based on investigations performed by me and other law enforcement agents, a determination was made that Lessard had purchased heroin from BRYAN MORAN and other individuals shortly before Lessard's death and that this heroin killed him. This investigation resulted in the indictment of MORAN and others for drug trafficking resulting in the death of Lessard for which BRYAN MORAN is facing a possible 20-year mandatory minimum sentence.

4.  LEE ANN BRIDGE was a friend of Matthew Lessard who cooperated with the DEA in the investigation of Matthew Lessard's death. BRIDGE made consenually recorded telephone calls to BRYAN MORAN and made a controlled purchase of heroin from BRYAN MORAN on February 8, 2003 for which BRYAN MORAN was thereafter indicted and convicted. BRIDGE also testified against BRYAN MORAN in a

trial before Judge Robert Keeton in July, 2003 in which BRYAN MORAN was convicted of an additional drug trafficking offense. BRIDGE was also subpoenaed to Federal Court in the BRYAN MORAN case on June 30, 2004 to testify in a scheduled sentencing hearing.

5. I am submitting this affidavit in support of an application for a criminal complaint charging **CARLI HOLLAND** with witness retaliation in violation of 18 U.S.C. § 1513(b). I thus am familiar with this investigation as a result of my personal participation in it and my conversations with other law enforcement officers. I submit this affidavit based upon my personal knowledge derived from my participation in this investigation and upon information that I have received from a variety of other sources, including other law enforcement officers and agents.

6. On Wednesday, June 30, 2004, I interviewed Court Security Officer ("CSO") WILLIAM O'MEARA who provided the following. At approximately 9:30 a.m. on June 30, CSO O'MEARA was acting as a security marshal in Courtroom 3 at the John Joseph Moakley United States Courthouse, Boston, Massachusetts for a hearing on <u>United States v. Bryan Moran, et al.</u>, Criminal No. 02-10136 (REK). CSO O'MEARA observed only two spectators in the courtroom who were two females later identified as **CARLI HOLLAND** and ALYSHA MORAN. During the hearing, CSO O'MEARA needed to verbally advise **HOLLAND** and ALYSHA MORAN not to talk in the courtroom during the hearing.

Both individuals ceased their discussion.

7. At approximately 10:00 a.m. when the hearing was complete, **HOLLAND** and ALYSHA MORAN departed Courtroom 3. Within a couple of minutes of the completion of the hearing, CSO O'MEARA also departed Courtroom 3. As he left the courtroom, CSO O'MEARA saw LEE ANNE BRIDGE outside of Courtroom 3, visibly distraught and crying. CSO O'MEARA approached BRIDGE and BRIDGE's acquaintance, SCOTT CAMPBELL. CSO O'MEARA asked BRIDGE what was wrong, and BRIDGE told CSO O'MEARA that two females had verbally threatened her. BRIDGE identified the females as the two females that had just exited the Courtroom 3.

8. CSO O'MEARA ran to the rotunda of the Courthouse and ordered, both by shouting and over his radio, that the front entrance CSO's not let **HOLLAND** and ALYSHA MORAN leave the courthouse. **HOLLAND** and ALYSHA MORAN were thereby stopped, and asked to wait at the front entrance security checkpoint.

9. Also on June 30, I interviewed CSO JOHN GILLESPIE who provided the following. CSO GILLESPIE was working outdoor security for the courthouse at approximately 10:15 a.m. when he was ordered by the Lead CSO JACK BROSNAHAN to get information on HOLLAND and ALYSHA MORAN who were waiting at the front entrance security checkpoint. CSO GILLESPIE obtained the following identifying information from the blond haired female: **Carli Holland, DOB 01-02-1983, 24 Beaver Street, Unit G, Lowell, MA, 978-314-8155.** CSO GILLESPIE obtained the following

identifying information from the dark haired female: Alysha Moran, DOB 7-02-1987, 6 Kirk Street, Wilmington, MA, 978-657-0399. **HOLLAND** and ALYSHA MORAN repeatedly asked CSO GILLESPIE whether they were "in trouble." They also told CSO GILLESPIE that they had done something that they knew they "should not have," and they asked whether there was someone to whom they could "apologize." Since CSO GILLESPIE was only ordered to take **HOLLAND's** and ALYSHA MORAN's identifying information, he subsequently released them from the courthouse waiting area.

10. Also on June 30, I interviewed SCOTT CAMPBELL and LEE ANNE BRIDGE who provided the following. CAMPBELL, who accompanied BRIDGE to the courthouse that day, was waiting outside of Courtroom 3 with BRIDGE when two females came out of the courtroom at approximately 10:00 a.m. The two females, later identified as **HOLLAND** and ALYSHA MORAN, started having a conversation between themselves that was loud enough so that CAMPBELL and BRIDGE could overhear it. **HOLLAND** and ALYSHA MORAN began calling BRIDGE derogatory names including that she was a "junkie whore" and that she was a "c---sucker." **HOLLAND** and ALYSHA MORAN then proceeded to walk to the courthouse elevators while continuing to make derogatory remarks towards BRIDGE. BRIDGE began to cry and put her head in her hands.

11. After **HOLLAND** and ALYSHA MORAN reached the elevators and were out of CAMPBELL and BRIDGE's sight, **HOLLAND** returned into visible range of CAMPBELL and BRIDGE. **HOLLAND** then threatened

BRIDGE by stating "if he gets more than 25, you are going to get yours." **HOLLAND** was several feet away from CAMPBELL and BRIDGE while she was making these remarks; however, she was speaking loud enough so that CAMPBELL and BRIDGE could easily hear the threats. **HOLLAND** also stated to BRIDGE that she was "a rat" and told BRIDGE that "you're fucking dead". **HOLLAND** and MORAN then left. BRIDGE stated that this incident caused her to fear for her safety, as well as for the safety of her family.

12. On June 30, CSO O'MEARA interviewed YOLANDA HERNANDEZ who provided the following. At approximately 10:00 a.m., HERNANDEZ was walking from the elevator area on the third floor toward the courtrooms when she heard two females speaking loudly. She heard the females saying derogatory names and threats such as "wait till the case is over; you will see" and "you better watch out if he gets more than 25 years."

13. On June 30, I also interviewed HERNANDEZ who provided the following. Earlier in the day, at approximately 10:00 a.m., HERNANDEZ was outside Courtroom 3 at the John Joseph Moakley United States Courthouse, Boston, Massachusetts. While there, HERNANDEZ observed two white females, later identified as **HOLLAND** and ALYSHA MORAN, make derogatory remarks directed at LEE ANN BRIDGE. HERNANDEZ also observed the female with blonde hair point at LEE ANN BRIDGE and state, "If he gets 25 years you're gonna see what happens to you." HERNANDEZ also observed the female with dark hair yell at LEE ANN BRIDGE, "you're dead."

14. Based on the information contained in this affidavit, all of which is true and accurate to the best of my knowledge, information and belief, I believe that there is probable cause to believe that **CARLI HOLLAND** violated 18 U.S.C.§ 1513(b).

_____
TODD F. PROUGH
Special Agent
 Drug Enforcement Administration


Subscribed and sworn to
before me, this 1st day
of July, 2004.

_____
MARIANNE B. BOWLER
Chief United States Magistrate Judge